WOLLMAN, Chief Judge.
Section 4454 of the Balanced Budget Act of 1997 creates exceptions to the Medicare and Medicaid Acts for persons who have religious objections to the receipt of medical care. These exceptions enable such individuals to receive government assistance for nonmedical care that they receive in facilities that, for religious reasons, administer only nonmedical services. Appellants Bruce Bostrom, Steven Peterson, and Children’s Healthcare is a Legal Duty, Inc., utilizing taxpayer standing, filed suit in federal district claiming that section 4454 impermissibly establishes religion in violation of the First Amendment of the United States Constitution. The district court[1] found that section 4454 is a permissible accommodation of religion and thus does not transgress the Establishment Clause. We affirm.[2]
I. Factual Background
In 1965, Congress enacted the Medicare Act, 42 U.S.C. §§ 1395 et. seq., and the Medicaid Act, 42 U.S.C. §§ 1396 et. seq., in an attempt to make health care more readily available to certain segments of the public. The Medicare Act creates a system of comprehensive health insurance for the disabled and the elderly. See 42 U.S.C. § 1395c. Funded by federal employment taxes, Medicare reimburses hospitals and skilled nursing facilities for the costs of providing hospital and post-hospital care to program beneficiaries. See 42 U.S.C. §§ 1395d(a), 1395f. The Medicaid Act, in contrast, provides medical assistance to low-income families with dependent children and to impoverished individuals who are aged, blind, or disabled. See 42 U.S.C. § 1396. Medicaid is jointly financed by the federal and state governments and is administered by the states, which must submit plans that meet broad statutory requirements in order to receive federal funding. See 42 U.S.C. §§ 1396, 1396(a).
From their enactment until 1996, both the Medicare and Medicaid Acts contained express exceptions for members of the First Church of Christ, Scientist (Christian Scientists), a religious group that objects to medical care and embraces prayer as the sole means of healing. The exceptions sought to extend to Christian Scientists the nonmedical elements of Medicare- and Medicaid-funded services, and also to except Christian Science sanitoria, the facilities providing such care, from the Acts’ medical oversight requirements. The exceptions remained in effect until August 7, *1089 1996, when the United States District Court for the District of Minnesota declared them unconstitutional as facially discriminating among religious sects in violation of the Establishment Clause. See Children’s Healthcare is a Legal Duty, Inc. v. Vladeck, 938 F.Supp. 1466, 1486 (D.Minn.1996) (CHILD I).
In response to CHILD I, Congress enacted section 4454 of the Balanced Budget Act of 1997. Act of Aug. 5, 1997, Pub.L. No. 105-33, § 4454, 111 Stat. 251, 426-32. With section 4454, Congress sought to replace the sect-specific portions of the Medicare and Medicaid Acts “with a sect-neutral accommodation available to any person who is relying on a religious method of healing and for whom the acceptance of the medical health services would be inconsistent with his or her religious beliefs.” H.R. Conf. Rep. No. 105-217, at 767 (1997). To achieve this end, Congress struck all references to “Christian Science sanitoria” contained within the Medicare and Medicaid Acts and replaced them with the phrase “religious nonmedical health care institutions” (RNHCIs). Congress then defined an RNHCI as an institution that, among other things, “provides only nonmedical nursing items and services exclusively to patients who choose to rely solely upon a religious method of healing or for whom the acceptance of medical health services would be inconsistent with their religious beliefs,” and that “on the basis of its religious beliefs, does not provide ... medical items and services ... for its patients.” 42 U.S.C. §§ 1395x(ss)(l)(C), (F).
Section 4454’s incorporation of RNHCI terminology into the Medicare and Medicaid Acts enables individuals who hold religious objections to medical care to receive government assistance for care that they receive at RNHCIs, and it also frees RNHCIs from all medically-based supervision. Section 4454 achieves these results under the Medicare Act through three primary provisions. First, section 4454 expressly includes RNHCIs within Medicare’s definition of “hospital” and “skilled nursing facility,” designations required for Medicare coverage, even though RNHCIs do not meet the technical criteria necessary to qualify as either of these facilities. See 42 U.S.C. §§ 1395x(e), 1395x(y)(l). Second, section 4454 provides that Medicare will pay for services rendered in an RNHCI if the recipient of the services has a condition such that the recipient would have been entitled to Medicare benefits if the recipient had received the same services in a medical facility. See 42 U.S.C. § 1395i — 5(a)(2). Third, .section 4454 exempts RNHCIs from the medical oversight requirements of 42 U.S.C. § 1320c, which establishes “peer review organizations” that oversee the services provided in facilities that qualify for Medicare funding. See 42 U.S.C. § 1320c-ll.
Section 4454 accomplishes the same results under the Medicaid Act through two key provisions. First, it modifies the statutory requirements for state Medicaid plans when such plans relate to RNHCIs. See 42 U.S.C. § 1396a(a). For example, state plans may not establish state agency oversight of the quality of care provided in RNCHIs, nor may they require RNHCI utilization review committees, the in-house groups that review admissions decisions, to be composed of medical personnel. See id. Second, section 4454 excludes RNHCIs from Medicaid’s definition of “nursing home,” thereby exempting RNHCIs from state licensing requirements for nursing home administrators. See 42 U.S.C. § 1396g(e)(l).
In response to the enactment of section 4454, appellants brought the present action against the United States, contending that section 4454 violates the Establishment Clause both on its face and as applied to Christian Science sanitoria. The district court rejected appellants’ claim, granting summary judgment in favor of the government and intervenor Christian Scientists. The court found that section 4454 does not facially discriminate among religious sects and therefore is not *1090 subject to strict scrutiny review. The court then applied the less stringent standard of Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2106, 29 L.Ed.2d 745 (1971), and concluded that section 4454 is a permissible accommodation of religion under the Establishment Clause. This appeal followed.[3]
We review the district court’s grant of summary judgment de novo. See Henerey v. City of St. Charles, 200 F.3d 1128, 1131 (8th Cir.1999). In so doing, we must decide whether the record, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c).
II. Facial Challenge to Section 4454
In considering appellants’ facial challenge, we initially must determine whether section 4454 discriminates among religious sects.[4] If so, we apply strict scrutiny review under Larson v. Valente, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). If not, we administer the three-part test set forth by the Supreme Court in Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). See Hernandez v. Commissioner, 490 U.S. 680, 695, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) (applying the Lemon test where no facial sect preference exists).
A.
In Larson, the Supreme Court held that a law that on its face grants a denominational preference may be upheld only if it is supported by a compelling state interest. See 456 U.S. at 246-47, 102 S.Ct. 1673; Hernandez, 490 U.S. at 695, 109 S.Ct. 2136. To facially discriminate among religions, a law need not expressly distinguish between religions by sect name. See Larson, 456 U.S. at 232 n. 3, 102 S.Ct. 1673. Such discrimination can be evidenced by objective factors such as the law’s legislative history and its practical effect while in operation. See Church of the Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 535, 540, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993); Larson, 456 U.S. at 254, 102 S.Ct. 1673.
Citing these factors, appellants contend that section 4454 is “unmistakably targeted to Christian Science institutions” and thus is a denominational preference that is subject to strict scrutiny review. The district court rejected appellants’ argument and refused to apply strict scrutiny. We agree. Section 4454, in our view, does not facially differentiate among religious sects, for its terms, legislative history, and effect all suggest denominational neutrality.
Section 4454 is by its terms sect-neutral. It does not include or disqualify any particular sect by name, but instead uses religiously neutral terms to define RNHCIs, see 42 U.S.C. § 1395x(ss)(1), and those persons who may receive Medicare and Medicaid coverage for care received in *1091 RNHCIs, see 42 U.S.C. § 1395i-5(b)(2)(A). Indeed, an individual may elect to receive Medicare- and Medicaid-funded services in an RNHCI simply by stating that he or she is “conscientiously opposed” to medical treatment and that such treatment is “inconsistent with his or her sincere religious beliefs.” See id.
Section 4454’s legislative history suggests that it is facially neutral among religions. Although Congress enacted section 4454 in response to CHILD I, appellants’ characterization of section 4454 as nothing more than an attempt to “reinstate” to Christian Scientists the benefits invalidated in CHILD I is supported only by a selective and strained reading of the legislative history. A more accurate reading, in our view, reveals that the legislative impetus behind section 4454 was to accommodate all persons who object to medical care for religious reasons, not only Christian Scientists. See H.R. Conf. Rep. 105-217, at 768; 143 Cong. Rec. S8447 (daily ed. July 31, 1997) (statement of' Sen. Hatch). Congress was explicit that section 4454 was intended to provide “a sect-neutral accommodation available to any person ... for whom the acceptance of medical health services would be inconsistent with his or her religious beliefs.” H.R. Conf. Rep. 105-217, at 768 (emphasis added). Whether the religious objector is of the Christian Science faith or some other sect is immaterial; section 4454’s benefits were intended for all persons who embrace spiritual healing over medical treatment.
The legislative history of section 4454 also distinguishes this case from Larson. There, the Supreme Court applied strict scrutiny to a statute governing reporting requirements for charitable organizations because it found that the statute was “drafted with the explicit intention of including particular religious denominations and excluding others.” Larson, 456 U.S. at 254, 102 S.Ct. 1673. The Court relied on the statute’s legislative history to reach this conclusion, specifically noting that a provision found within an early draft of the law was struck because it would have brought a Roman Catholic Archdiocese within the law’s scope, a result the legislature did not want. See id. In this case, there is no such evidence that Congress sought to include only Christian Scientists within the challenged provisions or, conversely, to exclude any other denomination.
Finally, the practical effect of section 4454 does not render it facially discriminatory. Appellants contend that section 4454 effectively discriminates among' sects because the “criteria for a RNHCI were carefully gerrymandered to include only the Christian Science sanitoria, and to exclude as many other institutions as possible that could render the same care.” However, even if appellants are correct that few facilities other than Christian Science sanitoria qualify as RNHCIs, this alone is insufficient to make section 4454 impermissibly discriminatory. See Larson, 456 U.S. at 246-47, n. 23, 102 S.Ct. 1673; Gillette v. United States, 401 U.S. 437, 452, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971). In addition to disparate impact, a “claimant alleging ‘gerrymander’ must be able to show the absence of a neutral, secular basis for the lines government has drawn.” Id.; see Church of the Lukumi Babalu Aye, 508 U.S. at 535, 113 S.Ct. 2217. Because we believe that the detailed eligibility requirements set forth by Congress for RNHCI status reflect valid secular justifications, we conclude that section 4454 does not, in effect, constitute a religious gerrymander subject to strict scrutiny.
First, section 4454’s limitation of RNHCI status to those institutions that provide only nonmedical services, see 42 U.S.C. § 1395x(ss)(l)(F), and that serve only patients who rely upon a religious method of healing, see 42 U.S.C. § 1395x(ss)(l)(C), seeks to prevent fraud and abuse of the Medicare and Medicaid programs. See H.R Conf. Rep. 105-217, at 769. By denying RNHCI status to institutions that do not exclusively treat *1092 persons that embrace spiritual healing, these eligibility criteria significantly limit the number of facilities that may be reimbursed for the provision of nonmedical care and that therefore must be monitored for compliance with section 4454. This limitation enables the government, in monitoring section 4454 compliance, to focus its time and resources on patients concentrated in a relatively small number of facilities, rather than on patients in thousands of health care institutions nationwide. As a result, the administration of section 4454 is both more manageable and effective, thereby decreasing the possibility that it will be used as a tool to defraud or abuse the Medicare and Medicaid programs.
Second, section 4454’s exclusion from RNHCI status of those facilities that provide medical care, see 42 U.S.C. § 1395x(ss)(l)(C), that employ medical personnel, see 42 U.S.C. § 1395x(ss)(l)(D), and that are affiliated with medical care providers, see 42 U.S.C. § 1395x(ss)(l)(G), seeks to ensure the safety of patients receiving medical care through Medicare and Medicaid. See H.R Conf. Rep. 105-217, at 769. Without these requirements, an institution that provides both medical and spiritual healing services might qualify as an RNHCI and therefore evade the medical oversight and other quality of care standards that Medicare and Medicaid impose on all medical institutions, but not on RNHCIs. Such a result would compromise the safety of persons receiving medical care at institutions that also promote spiritual healing. Thus, these' eligibility requirements ensure that only those facilities that provide no medical care are exempt from the medical oversight requirements; all others are subject to the full panoply of oversight mechanisms.
We are therefore satisfied that the detailed RNHCI eligibility requirements adopted by Congress reflect valid secular justifications. These eligibility requirements extend health care benefits to those individuals who are opposed to medical treatment and at the same time ensure patient safety and the overall vitality of the Medicare and Medicaid programs. In this sense, section 4454 resembles 26 U.S.C. § 1402(g), which exempts from social security taxes members of religious sects that have tenets opposed to the social security system. See 26 U.S.C. § 1402(g). Although section 1402(g) in practice applies almost exclusively to the Amish religious sect, courts have refused to apply strict scrutiny review to this provision because it has the valid secular purposes of “ensur[ing] the viability of the Social Security system and the coverage of all individuals in a public or private welfare plan.” Droz v. Commissioner, 48 F.3d 1120, 1124 (9th Cir.1995); see Jaggard v. Commissioner, 582 F.2d 1189, 1190 (8th Cir.1978) (per curiam). The same is true of section 4454; it was intended to extend health care benefits to as many people as possible while at' the same time ensuring the continued viability of the Medicare and Medicaid programs. Thus, we reject appellants’ contention that section 4454 constitutes gerrymandering in favor of Christian Scientists and therefore should be subject to strict scrutiny.[5]
In sum, we conclude that the district court properly refused to apply strict scrutiny review to section 4454 because it does not facially discriminate among religious sects.
B.
Having found that section 4454 is not subject to strict scrutiny review, we *1093 apply the three-part test set forth by the Supreme Court in Lemon, 403 U.S. at 612-13, 91 S.Ct. 2105. See Hernandez, 490 U.S. at 695, 109 S.Ct. 2136. Under the Lemon test, a law is permissible under the Establishment Clause only if: (1) it has a secular legislative purpose, (2) its primary effect is neither to advance nor to inhibit religion, and (3) it does not foster excessive government entanglement with religion.[6] See Lemon, 403 U.S. at 612-13, 91 S.Ct. 2105.
1.
The requirement that the law reflect a valid secular purpose “aims at preventing the relevant governmental decisionmaker ... from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters.” In re Young, 141 F.3d 854, 862 (8th Cir.1998), cert. denied, 525 U.S. 811, 119 S.Ct. 43, 142 L.Ed.2d 34 (1998) (quoting Corp. of the Presiding Bishop v. Amos, 483 U.S. 327, 335, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987)). This neutrality, however, “do[es] not require the government to be oblivious to impositions that legitimate exercises of state power may place on religious belief and practice.” Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet, 512 U.S. 687, 705, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994). Accordingly, the alleviation of a special, government-created burden on religious belief and practice constitutes a valid secular purpose under Lemon. See id.; Amos, 483 U.S. at 338, 107 S.Ct. 2862.
Relying on these principles, the district court found that section 4454 possesses a secular legislative purpose because it removes a special burden imposed by the Medicare and Medicaid Acts upon persons who hold religious objections to medical care. We agree. The Supreme Court in Sherbert v. Verner held that legislation which forces an individual to choose between following his religious beliefs and receiving government benefits places a burden on that person’s religious exercise. See 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). In Thomas v. Review Board of Indiana Employment Security Division, the Court reiterated this principle, stating that “[w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith ..., thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists.” 450 U.S. 707, 717-18, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); see Frazee v. Illinois Dep’t of Employment Sec., 489 U.S. 829, 832, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989); Hobbie v. Unemployment Appeals Comm’n, 480 U.S. 136, 141, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987).
Absent section 4454, the Medicare and Medicaid Acts place individuals who hold religious objections to medical care in a situation similar to that contemplated by the Sherbert line of cases. They are forced to choose between adhering to their religious beliefs and foregoing all government health care benefits, or violating their religious convictions and receiving the medical care provided by Medicare and Medicaid. The pressure to violate religious convictions is especially acute under Medicaid, which often represents the only source of health care for indigent persons. By extending nonmedical health care benefits to individuals who object for reasons of religion to medical treatment, section 4454 spares such individuals from being forced to choose between adhering to the tenets of their faith and receiving government *1094 aid, and in doing so removes a burden that the law would otherwise impose.
Appellants contend that the Sherbert line of cases is inapposite to the present situation. They note that those cases involved accommodations that were required by the Free Exercise Clause (mandatory accommodations), whereas here the government does not contend that section 4454 is constitutionally required but only that it is permitted by the Establishment Clause (permissive accommodation). Appellants argue that within the context of a government benefit program only the alleviation of a burden so substantial that it implicates the Free Exercise Clause constitutes a secular purpose justifying accommodation. Because the government concedes that the burden relieved by section 4454 does not rise to this level, appellants conclude that section 4454 does not reflect a valid secular purpose.
We do not believe that the fact that Sherbert and its progeny involved mandatory accommodations renders them irrelevant to our analysis of section 4454’s purpose. Indeed, those cases offer insight into what constitutes a burden on religious belief and whether the alleviation of that burden constitutes a valid legislative purpose under Lemon.
The Supreme Court has made clear that “[t]he limits of permissible state accommodation to religion are by no means coextensive • with the noninterference mandated by the Free Exercise Clause.” Walz v. Tax Comm’n, 397 U.S. 664, 673, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). Thus, it follows that some government-imposed burdens upon religion, although not severe enough to require accommodation under the Free Exercise Clause, may be sufficiently onerous to permit Congress to alleviate them without transgressing the Establishment Clause. To hold otherwise would be to limit Congress’s power to accommodate religion to only those situations in which the accommodation is constitutionally required. Such a result would not only violate the Court’s command in Walz, see id., it would also run counter to cases in which permissive accommodations have been upheld, see Amos, 483 U.S. at 336-39, 107 S.Ct. 2862; Zorach v. Clauson, 343 U.S. 306, 315, 72 S.Ct. 679, 96 L.Ed. 954 (1952); Jaggard, 582 F.2d at 1190.
Accordingly, Sherbert and its progeny provide a starting point for determining when a government-imposed burden is sufficient to warrant a permissive accommodation. We conclude that, absent section 4454, the burden imposed by the Medicare and Medicaid Acts on persons who for religious reasons object to medical treatment justifies such an accommodation. In Sherbert, the plaintiff was forced to decide between adhering to her religious beliefs and receiving unemployment compensation benefits. See Sherbert, 374 U.S. at 401, 404, 83 S.Ct. 1790. Without section 4454, the dilemma facing individuals who object to medical care is not significantly less foreboding, as they must choose whether to follow their faith or to accept government-funded health care. Although unemployment benefits may be broader in scope than health care benefits, both are widely available public benefits that are of great importance to personal well-being. Just as the burden in Sherbert was sufficient to require religious accommodation, we conclude that the burden imposed by the Medicare and Medicaid Acts, absent section 4454, is sufficient to permit congressional accommodation in a manner that does not run afoul of the Establishment Clause.
We therefore agree with the district court that, absent section 4454, the pressure imposed by the Medicare and Medicaid Acts upon certain individuals to accept medical care in violation of their religious beliefs constitutes a burden upon the exercise of those beliefs. See, e.g., Sherbert, 374 U.S. at 404, 83 S.Ct. 1790. Because it attempts to alleviate this burden by enabling such individuals to receive the non-medical portion of Medicare and Medicaid-funded care, section 4454 reflects a valid secular purpose.
*1095 2.
The second part of the Lemon test requires that the law’s primary effect be neither to advance nor to inhibit religion. The parties contest the precise contours of this inquiry. Appellants contend that the tripartite “primary effect” framework articulated by the Supreme Court in Agostini v. Felton is applicable to all cases implicating the Establishment Clause, including those, like this, that involve religious accommodation. See 521 U.S. 203, 117 S.Ct. 1997, 2016, 138 L.Ed.2d 391 (1997).[7] The government argues that the proper analysis for assessing the primary effect of section 4454 is that which has been used by the Court in other cases involving legislative attempts to accommodate religion.
We agree with the position taken by the government. Agostini did not involve a religious accommodation, but instead concerned a generally applicable program of government assistance that incidentally benefited parochial schools. See Agostini, 117 S.Ct. at 2003-04. This distinction is significant because the second element of Agostini’s primary effect analysis — that recipients of government aid may not be defined “by reference to religion” — is by its terms inconsistent with the Supreme Court’s accommodation cases. The Court has on numerous occasions upheld laws of religious accommodation that have expressly defined beneficiaries by reference to religion. See, e.g., Amos, 483 U.S. at 329 n. 1, 338, 107 S.Ct. 2862 (exemption of religious organizations from Title VII); Walz, 397 U.S. at 666 n. 1, 673, 90 S.Ct. 1409 (state property tax exemption for religious facilities); Zorach, 343 U.S. at 308 n. 1, 315, 72 S.Ct. 679 (state program releasing public school children to religious institutions for religious instruction). Therefore, while Agostini’s tri-partite framework is relevant in analyzing the primary effect of generally applicable government programs that incidentally benefit religion, it does not lend itself to an examination of the effect of laws that are specifically designed to alleviate government-imposed burdens on religious practice and belief.
A more appropriate primary effect analysis, in our view, is that which the Court has applied to other legislative attempts to accommodate religion. See Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 11, 15-16, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989) (plurality opinion); Amos, 483 U.S. at 337, 107 S.Ct. 2862; Estate of Thornton v. Caldor, Inc., 472 U.S. 703, 709-10, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985); see also Young, 141 F.3d at 862. Under this line of cases, legislation does not violate the second part of the Lemon test merely because it gives special consideration to a religious group or even because it better enables a religious institution to advance its cause. See Amos, 483 U.S. at 337-38, 107 S.Ct. 2862. Instead, a religious accommodation impermissibly advances or inhibits religion only if it imposes a substantial burden on nonbeneficiaries, see Texas Monthly, 489 U.S. at 15, 18 n. 8, 109 S.Ct. 890; Estate of Thornton, 472 U.S. at 709-10, 105 S.Ct. 2914, or provides a benefit to religious believers without providing a corresponding benefit to a large number of nonreligious groups or individuals, see Texas Monthly, 489 U.S. at 11, 109 S.Ct. 890; Amos, 483 U.S. at 337, 107 S.Ct. 2862; Young, 141 F.3d at 862.
The only potential burden that we can envision section 4454 imposing on non-beneficiaries is an increased tax burden if, for example, the cost of care provided by an RNHCI is on average more costly than that provided by a medical institution, thereby increasing the total tax revenue needed to fund the Medicare and Medicaid programs. This does not appear to be the case. Even assuming as true appellants’ *1096 assertion that RNHCI patients average longer institutional stays than medical patients, we believe that any increased cost caused by such stays is almost certainly offset by the lower costs of the services provided to RNHCI patients. See Letter from Carolyne K. Davis, Health Care Finance Administrator, to Rep. Berkley Be-dell of 11/23/83. RNHCI patients receive none of the costly medical procedures, such as x-rays and laboratory tests, and only a small percentage of the physical care services received by persons obtaining care at medical institutions. See 42 U.S.C. § 1395x(ss)(l)(C); Hearing on H.R. 6675 Before the Senate Comm, on Finance, 89th Cong. 699 (1965) (statement of Dr. J. Buroughs Stokes).
Furthermore, even if section 4454 does impose some increased financial burden on nonbeneficiaries, any such burden is too minimal and diffuse to violate the second part of the Lemon test. See Estate of Thornton, 472 U.S. at 710, 105 S.Ct. 2914 (striking down Sabbath observance law because it contained no exceptions designed to relieve the burden on employers and other employees). This is particularly true in light of the regulations implementing section 4454, which place detailed limits upon Medicare and Medicaid expenditures for RNHCI-provided services. See 42 C.F.R. §§ 403.750, 403.754, 403.756. We are satisfied, therefore, that section 4454 does not impermissibly burden non-beneficiaries.
Next, we consider whether section 4454 confers a special benefit upon individuals who hold religious objections to medical care. See Texas Monthly, 489 U.S. at 11, 109 S.Ct. 890. Appellants contend that section 4454 bestows upon RNHCI patients benefits not available to the general public, making it possible for them to receive Medicare and Medicaid coverage for services that would not be covered if administered in a medical institution. The district court rejected appellants’ argument and found that because section 4454 merely permits RNHCI patients to receive a “subset,” i.e. the nonmedical portion, of the care provided by Medicare and Medicaid to patients of medical institutions, it extends no special benefit to religious believers who receive care at RNHCIs.
In support of their “special benefit” reading of section 4454, appellants focus upon “custodial care,” a technically defined category of care that Medicare expressly excludes from its coverage. See 42 U.S.C. § 1395y(a)(9). Custodial care is any care that is not ordered by a physician and that is not “so inherently complex” that it must be performed by, or under the supervision of, professional personnel. See 42 C.F.R. § 411.15(g); see also 42 U.S.C. §§ 409.31-.32. Custodial care thus includes the administration of ointments, routine care of incontinence, assistance in dressing and eating, and other similar services. See 42 C.F.R. § 409.33(d). Such services, however, are not considered custodial when given as part of an integrated plan of care that, as a whole, requires professional supervision. See 42 C.F.R. § 409.33(a)(1); Hurley v. Bowen, 857 F.2d 907, 912-13 (2nd Cir.1988). Relying on this technical definition, appellants contend that all services provided by RNCHIs constitute custodial care because RNHCIs lack the medical personnel who, by definition, must participate in order for services to be deemed non-custodial, or “skilled.” Appellants thus conclude that section 4454, by reimbursing RNHCI patients for the care that they receive, confers a benefit on such persons not available to individuals who receive care at medical institutions.
Appellants’ narrow fixation on the definition of custodial care, however, overlooks the fact that RNHCI patients are not reimbursed for any services for which they would not be similarly reimbursed if they had sought care at a medical institution. Thus, section 4454 confers no special benefit upon piersons who hold religious objections to medical care; it merely accommodates them.
Most critically, appellants ignore the fundamental principle upon which section *1097 4454 is based and the practical effect that this principle has upon its operation. Section 1395i-5(a)(2) provides that Medicare and Medicaid payments may be made for “services furnished an individual in [an RNHCI] only if the individual has a condition such that the individual would qualify for benefits ... if the individual were an inpatient or resident in a hospital or skilled nursing facility that was not [an RNHCI].” 42 U.S.C. § 1395i-5(a)(2) (emphasis added). Thus, an RNHCI patient whose illness is such that he would have received skilled care if he were at a medical institution may be reimbursed for the nonmedical services he receives at an RNHCI because, had he attended a medical facility, he would have been reimbursed for such services as part of an aggregate plan of skilled care. See 42 C.F.R. § 409.33(a)(1). If, however, the patient’s illness would not require services sufficiently complex to be deemed skilled care if he were at a medical facility, the patient would not be entitled to any Medicare benefits, just as a medical institution patient would not be so entitled. Therefore, section 4454 extends to RNHCI patients only those benefits that they could have received if they had sought treatment at a medical institution, and then only a subset, i.e. the nonmedical portion, of those benefits.
Thus, while the fact that section 4454 does not require the involvement of medical personnel in RNHCI-provided care may render such care “custodial” under the regulations, it does not confer upon RNHCI patients any special benefit. RNHCI patients, just like medical patients, may not be reimbursed for services that, if performed in a medical facility, would not constitute skilled care. See 42 U.S.C. § 1395y(a)(9) (excluding custodial care from Medicare coverage for both medical institution and RNHCIs). RNHCI patients are thus never reimbursed for services for which medical patients are not similarly reimbursed. The only distinction is that the services provided by RNHCIs are not dispensed under professional medical supervision, a distinction that Congress found necessary to accomplish its purpose of accommodating individuals who have religious objections to medical care.
That section 4454 does not confer a special benefit upon RNHCI patients is perhaps best demonstrated by a more tangible illustration. Suppose, for example, that two patients with similar health problems sought care at the facilities of then-choice, with A attending a medical institution, and B an RNHCI. While at their respective institutions, both A and B receive the same basic physical nursing services, such as changing of bed pans and assistance with eating and bathing. A, however, receives these services along with medical services as part of an integrated plan of skilled care that requires professional supervision, while B receives only the nonmedical care services. Under the Medicare Act, A would be reimbursed for both the medical and the nonmedical services. Under section 4454, B, who had the very same condition as A, would also be reimbursed, although only for the limited, nonmedical care that he received.
On the other hand, if A’s health problems are such that he needs only general assistance in eating and bathing, with no overriding health concerns requiring medical supervision, he would not be reimbursed by Medicare for any of the care that he received. Likewise, B, again suffering from the same affliction as A and receiving the same physical nursing services, would not be reimbursed for such services because, under 42 U.S.C. § 1395i— 5(a)(2), B did not have “a condition such that [he] would qualify for benefits” if he were in a medical institution. Thus, section 4454 does not confer a special benefit upon individuals who are religiously opposed to medical treatment, but rather merely allows them to be reimbursed for a subset of those services for which they would be reimbursed if they had sought treatment at a medical institution. Al *1098 though such services technically may be “custodial,” in that medical professionals are not involved, the fact remains that the benefits received by such individuals are not in any way special, or above and beyond those which medical patients receive.[8]
Section 4454 does not in any other way impermissibly benefit the religious cause of individuals who object to medical care. Section 4454 does not create any more of an incentive for persons to engage in religion than other religious accommodations that have been upheld by the Supreme Court. See Amos, 483 U.S. at 329-30, 107 S.Ct. 2862 (exemption of religious institutions from Title VII’s non-discrimination provisions); Walz, 397 U.S. at 666-67, 90 S.Ct. 1409 (exemption of religious organizations from state property tax). Nor does section 4454 benefit religion by providing direct funding for religious activity. Section 4454 authorizes payment only for “inpatient hospital services or post-hospital extended care services,” 42 U.S.C. §§ 1395i-5(a), which are defined as bed and board and such other physical care services that are ordinarily furnished by health care facilities, see 42 U.S.C. §§ 1395x(b); 1395x(h). Thus, Medicare and Medicaid do not fund the spiritual healing services that may take place within RNHCIs. See Medicare and Medicaid Programs, 64 Fed.Reg. 67,028, 67,044 (1999) (“Neither Medicare nor Medicaid will pay for any religious, aspects of care provided in [RNHCIs].”).
Finally, section 4454 does not cause government aid to flow to “pervasively sectarian- institutions,” the funding of which constitutes an improper benefit to religion. See Bowen v. Kendrick, 487 U.S. 589, 609-610, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988). A pervasively sectarian institution is one in which religion so pervades its functions that any government aid it receives, even if designated for secular activities, impermissibly assists religion because the institution is unable to separate the funded secular activities from its religious mission. See id.; Roemer v. Bd. of Pub. Works, 426 U.S. 736, 753-54, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976). Conversely, an institution is not pervasively sectarian if its primary function is secular and if this function can be effectively separated from its religious activity. See id. at 755, 96 S.Ct. 2337. As so defined, we cannot say that RNHCIs are pervasively sectarian.
The primary function of RNHCIs, by definition, is to provide “nonmedical items and services to inpatients on a 24-hour basis” through “nursing personnel who are experienced in caring for the physical needs of [RNHCI] patients.” See 42 U.S.C. §§ 1395x(ss)(D), (E). Because these physical care services, such as dressing of wounds and assistance in eating, are inherently secular, see Lemon, 403 U.S. at 616-17, 91 S.Ct. 2105, and “are not converted into [religious activities] by the fact that they are carried out by organizations with religious affiliations,” Bowen, 487 U.S. at 613, 108 S.Ct. 2562, the primary function of RNHCIs is secular in nature. Furthermore, nothing in section 4454 suggests that these physical care services cannot be separated from the prayer and other religious activities that may occur within RNHCIs. Accordingly, because RNHCIs are not pervasively sectarian institutions, their receipt of government funding does not impermissibly benefit religion.
In sum, section 4454 does not in any way confer a special benefit upon religion.
3.
The third part of the Lemon test requires that the law not foster excessive *1099 government entanglement with religion. Appellants contend that section 4454 violates this part because it effectively delegates Medicare and Medicaid coverage decisions to RNHCIs in violation of Larkin v. Grendel’s Den, Inc., in which the Supreme Court struck down a law granting churches discretionary authority over the issuance of liquor licenses. See 459 U.S. 116, 126-27, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982). Appellants argue that section 4454 effects a similar delegation because it permits RNHCI utilization review committees, which are composed of lay persons who are religiously opposed to medical care, to make admissions and other coverage decisions that are not based on medical examination or diagnosis and that, according to appellants, are largely insulated from governmental review. Whatever merit this argument might have if RNHCIs in fact held ultimate decision-making authority regarding Medicare and Medicaid coverage, we do not believe that section 4454 grants RNHCIs such authority, either on its face or in effect.
Section 4454, by its terms, makes clear that an RNHCI offers only an initial recommendation regarding Medicare and Medicaid coverage. See 42 U.S.C. §§ 1395x(ss)(l)(H)-(J), 1395x(ss)(3)(B)(ii). This recommendation must contain information regarding the RNHCI’s coverage determination and any other information that the Secretary may deem necessary to effectively review the RNHCI’s decision. See 42 U.S.C. §§ 1395x(ss)(l)(I)-(J). The Secretary, typically acting through a fiscal intermediary in the form of a private insurance company, then reviews the RNHCI’s recommendation to finally determine whether the patient is entitled to Medicare or Medicaid benefits for the services provided by the RNHCI. See 42 U.S.C. §§ 1395x(ss)(l)(H)-(J), 1395x(ss)(3)(B)(ii). Thus, section 4454 expressly provides for governmental review of RNHCI coverage decisions and establishes a procedure to achieve this end.
Furthermore, the governmental review required by section 4454 is, in our view, substantial. First, we are confident that the Secretary has access to sufficient information to conduct a meaningful review of an RNHCI’s coverage recommendation. Although the Secretary cannot require RNHCI patients to undergo a medical examination to assist her in her review, see 42 U.S.C. § 1395x(ss)(3)(A)(i), she is authorized to obtain any other information that she believes to be necessary to perform her evaluation, see 42 U.S.C. § 1395x(ss)(3)(A)(ii). Indeed, the Secretary is expressly empowered to deny Medicare and Medicaid benefits to an RNHCI patient if any information requested is not provided. See id. Second, we see no reason to question the soundness of Congress’s judgment that the Secretary generally will be able to make a competent coverage determination based upon the nonmedical information available to her. That the Secretary’s evaluation may be made more difficult by the lack of medical data does not render her review illusory.
Section 4454 requires RNHCIs to make reasoned coverage recommendations that are subject to meaningful governmental review. This stands in stark contrast to the decision-making authority present in Larkin, where the church possessed authority that “call[ed] for no reasons, findings, or reasoned conclusions,” and which was subject to no review whatsoever. Larkin, 459 U.S. at 125, 127, 103 S.Ct. 505. We thus conclude that section 4454 does not impermissibly delegate authority to RNCHIs in violation of the third part of the Lemon test.
In sum, we agree with the district court that section 4454 constitutes a permissible accommodation of religion.
III. As-Applied Challenge to Section 4454
Appellants also argue that, even if not unconstitutional on its face, section 4454 violates the Establishment Clause as applied to Christian Science sanitoria. *1100 Appellants contend that section 4454 benefits the Christian Science sect in violation of the second part of the Lemon test because it authorizes direct funding of Christian Science sanitoria, institutions that appellants claim to be pervasively sectarian in nature. An institution is not pervasively sectarian, however, if its primary function is secular and if this function can be effectively separated from the institution’s religious activity. See Roemer, 426 U.S. at 755, 96 S.Ct. 2337. Because we find that Christian Science sanitoria possess both of these qualities, we conclude that Christian Science sanitoria, like all RNHCIs, are not pervasively sectarian.
First, the primary function of Christian Science sanitoria is secular in nature. Christian Science sanitoria predominantly provide physical nursing services to sick individuals. See Ruth Anne Cook Aff. ¶ 16 (Christian Science nurses bathe patients, wash and bandage sores, change bed pans, and assist patients in dressing and walking). Although Christian Science nurses administer these services with the hope that they will assist the spiritual healing process, a religious motivation on behalf of a party providing secular services does not transform such services into religious activity. See Bowen, 487 U.S. at 613, 621, 108 S.Ct. 2562. Thus, the primary function of Christian Science sanitoria — the provision of physical nursing services — is secular.
Second, the physical services provided by Christian Science sanitoria are distinct and separable from any religious activity that may take place within such facilities. Just as the provision of health services in religious schools does not have the primary effect of aiding religion, see Wolman v. Walter, 433 U.S. 229, 242, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), no more so does the administering of mundane physical services in Christian Science sanitoria. Accordingly, we reject appellants’ as-applied challenge to section 4454.
Conclusion
For all of the reasons set forth above, we affirm the judgment of the district court.

. The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

. We grant appellants’ motion to expand the record on appeal.

. Appellants also appeal the district court’s denial of their motion to supplement the record with documents they obtained after the summary judgment filing deadline. Because , , appellants filed the motion at such a late time, less than ten days before the court issued its decision, and because wé find the evidence cumulative of other evidence in the record, we conclude that the district court did not abuse its discretion in denying the motion. See Moad v. Arkansas State Police Dep’t, 111 F.3d 585, 587 (8th Cir.1997); Callanan v. Runyun, 75 F.3d 1293, 1297 (8th Cir.1996).

. Intervenor Christian' Scientists contend that appellants lack standing to assert a facial challenge to section 4454. We disagree. Although appellants’ claim implicates equal protection concerns and thus would seem to make the standing requirements of equal protection cases applicable, appellants’ claim ultimately challenges Congress's disbursement of funds under the Establishment Clause. Thus, we believe that appellants have standing to challenge section 4454 because there is a sufficient nexus between appellants' status as taxpayers and Congress's exercise of its taxing and spending power through the Medicare and Medicaid Acts. See Flast v. Cohen, 392 U.S. 83, 102-03, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

. Appellants cite Grumet v. Pataki, 93 N.Y.2d 677, 697 N.Y.S.2d 846, 720 N.E.2d 66 (1999), cert. denied, - U.S. -, 120 S.Ct. 363, 145 L.Ed.2d 284 (1999), in support of their gerrymandering claim. The statute in that case, however, contained arbitrary wealth criteria that largely controverted any purported secular basis for the lines drawn by the statute, and the statute’s legislative history evidenced an intent to extend a benefit to a single religious sect. See id. at 689-90, 694—95, 697 N.Y.S.2d 846, 720 N.E.2d 66. In contrast, section 4454’s criteria have valid secular bases, and its legislative history suggests an intent to benefits all persons who because of religious beliefs object to medical care.

. Although the Supreme Court in Agostini v. Felton suggested that the entanglement inquiry may be analyzed as part of the primary effect element, it also noted that “the general principles we use to evaluate whether government aid violates the Establishment Clause have not changed.” 521 U.S. 203, 222, 117 S.Ct. 1997, 2010, 138 L.Ed.2d 391 (1997). Accordingly, we have continued to treat the primary effect and entanglement elements as distinct inquiries, see Stark v. Independent School Dist., No. 640, 123 F.3d 1068, 1073, 1075 (8th Cir.1997), and continue to do so here. See also Koenick v. Felton, 190 F.3d 259, 264-65 (4th Cir.1999); Bridenbaugh v. O’Bannon, 185 F.3d 796, 798 (7th Cir.1999).

. In Agostini, the court used three criteria to evaluate whether a law granting government aid to schools had the effect of advancing religion: (1) whether it results in governmental indoctrination; (2) whether it- defines its recipients by reference to religion; and (3) whether it creates an excessive entanglement with religion. See Agostini, 521 U.S. at 234, 117 S.Ct. at 2016.

. Appellants also argue that RNHCI patients receive a special benefit because coverage decisions regarding RNHCI patients are made by laypersons and without medical examination, thereby making it possible for RNHCI patients to be reimbursed for sendees that, under medical diagnosis, might have been found to be outside of the scope of Medicare and Medicaid coverage. Because we find that RNHCI coverage decisions are subject to substantial and meaningful review by the Secretary, or her agent, see Part H.A.3., we find this argument unpersuasive.'