The Honorable Janice A. Judy State Representative 202 W. Maple Street Fayetteville, AR 72701-4132
Dear Representative Judy:
This is in response to your request for my opinion regarding the propriety of the City of Fayetteville's establishing a trolley route that would include central pick-up and drop-off points for citizens on Sunday morning. You summarize the factual background as follows:
 Fayetteville is experiencing explosive growth, and there is a concentration of churches in one particular midtown area of Fayetteville. These churches have chosen to respond to this growth by growing in place, and this presents a serious threat to the historic neighborhoods surrounding the churches. To respond to the desire of their parishioners to park close to the front door, the churches have, and are in the process of, removing entire blocks of historic houses and replacing them with asphalt parking lots. The most intense need for parking is only for a few hours on Sunday morning.
 The City of Fayetteville operates a trolley system that moves citizens around its downtown areas. Some citizens have proposed that the city add a Sunday morning route that would include central pick-up and drop-off points for citizens on Sunday morning. The end result would be to lessen the need for so much parking for such a short period of time, and would help preserve the integrity of the historic neighborhoods in the core of the city.
However, you express concern that this proposal might be prohibited by principles discussed in the enclosed Ark. Op. Att'y Gen. No. 2001-083, which you characterize as opining that "an Arkansas city could not legally lease a city-owned van to a church or other nonprofit organization." Prompted by this concern, you have posed the following question:
 In light of Attorney General's Opinion 01-083, may the City of Fayetteville add a Sunday morning trolley route that would include central pick-up and drop-off points for citizens?
RESPONSE
Your request implicates Ark. Const. art. 12, § 5, which provides that no city shall "appropriate money for, or loan its credit to, any corporation, association institution or individual," the Establishment Clause of the U.S. Constitution, which provides that government "shall make no law respecting an establishment of religion . . .," U.S. Const. amend. 1, and the analogous religion clauses set forth at Ark. Const. art. 2, §§ 24 and 25. As reflected in my discussion below, determining whether the proposed trolley route would offend any of these constitutional provisions will entail engaging in an intense factual inquiry of the sort I am neither equipped nor authorized to conduct. However, I can and will set forth the standards I believe will apply in conducting this inquiry.
I should note at the outset that I disagree with your paraphrase of my conclusion in Ark. Op. Att'y Gen. No. 2001-083. Notwithstanding your suggestion to the contrary, I did not venture a blanket opinion that "an Arkansas city could not legally lease a city-owned van to a church or other nonprofit organization." Rather, my opinion regarding the permissibility of leasing public property was much more focused on the facts of each particular situation:
 [I]t is impermissible to lease out public realty unless it has ceased to serve its public purpose and only then for consideration that itself must be devoted to a public purpose. I believe a similar restriction applies to the leasing of publicly owned personalty. Moreover, as this office has noted on numerous previous occasions, not only must any municipal contract serve a public purpose, it must further be supported by adequate consideration. See, e.g., Ark. Ops. Att'y Gen. Nos. 2000-147, 99-408, 98-025 and 97-250. Determining whether this test has been met in any particular instance will entail conducting a detailed investigation into the facts.
Without repeating the analysis that led me to this conclusion, I will merely reiterate that any use of public property, including the trolley line at issue in your request, must meet the "public purpose" test outlined in my previous opinion in order to pass constitutional muster under Ark. Const. art. 12, § 5.
In my opinion, various factual questions might bear on the analysis described above. Among the inquiries I would expect a court to conduct in weighing a challenge to the proposed Sunday route would be whether the route would serve only or primarily churchgoers or, alternatively, whether a significant number of riders could be expected to use the route for the purely secular purpose of reaching non-church destinations; whether the route would vary from the locations of weekday stops in order to accommodate churchgoers; whether the timing of the route would be particularly geared to accommodate churchgoers; whether the churchgoers would be obligated to pay for the transportation; whether the proposed route would inordinately benefit one denomination over others; whether the fares charged would be sufficient to defray the costs of the trolley service or, alternatively, whether public funds would be committed to subsidize the transportation; whether the apparently public benefit of avoiding asphalt parking lots in historic areas might reasonably be characterized as the primary effect of establishing the route; and whether the city might embrace alternative remedies such as zoning ordinances in order to achieve what might well be deemed the legitimate public purpose of maintaining the unique architectural character of the midtown area. I must stress that I consider this list of factual issues purely illustrative of the inquiries a court might be inclined to conduct.
Although you do not mention the issue, I believe your request further invites analysis under the Establishment Clause of the U.S. Constitution. As the Eighth Circuit Court of Appeals noted in Children'sHealthcare v. Min de Parle, 212 F.3d 1084, 1090 (8th Cir. 2000), an Establishment Clause analysis necessarily begins with a determination of the standard under which the government action will be reviewed:
 [W]e initially must determine whether [the government action] discriminates among religious sects. If so, we apply strict scrutiny review under Larson v. Valente, 456 U.S. 228 (1982). If not, we administer the three-part test set forth by the Supreme Court in Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971). See Hernandez v. Commissioner, 490 U.S. 680, 695 (1989) (applying the Lemon test where no facial sect preference exists).
(Footnote omitted.) Because you identify the proposed route as serving a variety of churches and, I assume, anyone who might choose to ride the trolley for a nonsectarian purpose, I do not believe a court would apply a strict-scrutiny review, under which the city would need to establish that the ordinance establishing the route was supported by a compelling governmental interest and that the ordinance was closely fitted to further that interest. Larson, 456 U.S. at 246-47; Hernandez,490 U.S. at 695.
Under the alternative Lemon analysis, in order to avoid offending the Establishment Clause, a government action must be shown to (1) have a secular purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) not foster an excessive entanglement with religion. 403 U.S. at 612-13. With respect to the first of these elements, the court in Children's Healthcare observed:
 The requirement that the law reflect a valid secular purpose" aims at preventing the relevant governmental decision maker . . . from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." In re Young, 141 F.3d 854, 862 (8th Cir. 1998), cert. denied, 119 S.Ct. 43 (1998) (quoting Corp. of the Presiding Bishop v. Amos, 483 U.S. 327, 335
(1987)).
212 F.3d at 1093. This determination of intent would obviously be one of fact in each instance. With respect to the proposed ordinance at issue in your request, I assume a court would consider, inter alia, some or all of the factual issues recited above, as well as the fact that the city's overarching concern is reportedly not to advance religion, but rather to preserve the architectural integrity on the midtown area of Fayetteville.
In Agostini v. Felton, 521 U.S. 203, 232-33 (1997), the Court in effect conflated the final two elements in the Lemon analysis into a single prong based on the reasoning that "excessive entanglement" was in itself an element in determining whether a government action had the "primary effect" of advancing or inhibiting religion. The Court then held that government action cannot be deemed to result in the impermissible effect of promoting religion if it meets three criteria: "it does not result in governmental indoctrination; define its recipients by reference to religion; or create an excessive entanglement." Id. at 234; accordMitchell v. Helms, 530 U.S. 793, 807-08 (2000).
Again, the determination of what might be the primary effect of establishing the proposed trolley route will ultimately be one of fact that I am unauthorized and unable to make. However, as a general proposition, under the standard recited above, I suspect a court might well approve the establishment of a public transportation route even if it predominantly benefits churchgoers of various denominations, particularly if the court accepts that the primary purpose and effect are to preserve historic properties currently put to nonsectarian uses. This general conclusion appears consonant with the fact that I have been unable to locate a single instance in any jurisdiction in which a litigant has even challenged a public transportation route as violating the Establishment Clause, much less done so successfully.
The questions of whether and how the Establishment Clause impinges on publicly financed transportation to religious events has been raised most often with respect to the busing of students to parochial schools. As my immediate predecessor noted in the attached Ark. Op. Att'y Gen. No.98-207:
 In the seminal case on this issue, Everson v. Bd. of Educ., 330 U.S. 1
(1947), the U.S. Supreme Court upheld a New Jersey statute that authorized the use of public funds to reimburse the parents of parochial school children for the cost of the students' transportation to and from the parochial school. This aid was deemed to be neutral and non-religious in nature, in that it was not a direct funding of the school, and in that it applied equally to students of both parochial and public schools. Later, in Lemon v. Kurtzman, 403 U.S. 602 (1971), the court elaborated on this rationale as follows:
 Our decisions from Everson to Allen [Board of Education v. Allen, 392 U.S. 236, 243 (1968)] have permitted the States to provide church-related schools with secular, neutral, or nonideological services, facilities, or materials. Bus transportation, school lunches, public health services, and secular textbooks supplied in common to all students were not thought to offend the Establishment Clause.
403 U.S. at 616 (emphasis added).
Extrapolating from these cases, a court might conclude that trolley transportation that serves churchgoers and secular travelers alike does not offend the Constitution. However, as noted above, making this determination will ultimately depend on conducting a factual review that lies beyond the range of my authority.
Finally, I should note the applicability to your question of the religion clauses set forth at Ark. Const. art. 2, §§ 24 and 25, which provide:
24. Religious liberty.
 All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can, of right, be compelled to attend, erect or support any place of worship; or to maintain any ministry against his consent. No human authority can, in any case or manner whatsoever, control or interfere with the right of conscience; and no preference shall ever be given, by law, to any religious establishment, denomination or mode of worship above any other.
25. Protection of religion.
 Religion, morality and knowledge being essential to good government, the General Assembly shall enact suitable laws to protect every religious denomination in the peaceable enjoyment of its own mode of public worship.
As I recently observed in Ark. Op. Att'y Gen. No. 2001-163:
 Although the above-quoted religion clauses from the Arkansas Constitution are substantially different than the religion clauses of the U.S. Constitution, they are nevertheless generally analogous to the Establishment Clause and the Free Exercise Clause of the First Amendment to the U.S. Constitution. The analysis that the Arkansas Supreme Court has applied in interpreting these sections of the Arkansas Constitution appears likewise to be analogous to the analysis discussed above in connection with the religion clauses of the First Amendment. See, e.g., Abram v. City of Fayetteville, 281 Ark. 63, 661 S.W.2d 371 (1983); Cude v. State, 237 Ark. 927, 377 S.W.2d 816 (1964). Moreover, there has been no indication in any court opinion that these sections of the Arkansas Constitution are more restrictive than the religion clauses of the U.S. Constitution. See Lendall v. Cook, 432 F. Supp. 971, 976 (E.D. Ark. 1977); Cortez v. Independence County, 287 Ark. 279, 698 S.W.2d 291 (1985). I therefore find that it is not necessary to conduct a separate analysis of [the regulation] under these sections of the Arkansas Constitution.
Given the coextensive scope of the state and federal constitutions' religion clauses, I likewise do not feel any need independently to analyze how the state provisions apply to your request.
Assistant Attorney General Jack Druff prepared the foregoing, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:JD/cyh
Enclosure