341 F.3d 1132
 David KONG, Plaintiff-Appellant,
v.
Thomas SCULLY, in his official capacity as director of Center for Medicare and Medicaid Services;
Tommy Thompson, in his official Capacity as Secretary of the United States Department of Health and Human Services, Defendants-Appellees,
The First Church of Christ, Scientist, Defendant-Intervenor-Appellee.
 No. 02-15057.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 9, 2003 — San Francisco, California.
 Filed September 2, 2003.
 
 Robert J. Bruno, Brunsville, Minnesota, for the plaintiff-appellant.
 Lowell V. Sturgill, Jr., Department of Justice, Washington, D.C., for defendants-appellees Thomas Scully and Tommy Thompson.
 Stephen M. Shapiro, Chicago, Illinois, for the defendant-intervenor-appellee.
 Appeal from the United States District Court for the Northern District of California; Charles R. Breyer, District Judge, Presiding. D.C. No. CV-00-04285-CRB.
 Before: JOHN T. NOONAN, M. MARGARET McKEOWN, and JOHNNIE B. RAWLINSON, Circuit Judges.
 Opinion by Judge NOONAN; Concurrence by Judge McKEOWN; Concurrence by Judge RAWLINSON
 OPINION
 NOONAN, Circuit Judge.
 
 
 1
 David Kong appeals the judgment of the district court upholding as constitutional on its face and as applied section 4454 of the Balanced Budget Act of 1997. This law effected amendments to 42 U.S.C. § 1320 and 42 U.S.C. § 1395 in order to permit payments under Medicare and Medicaid Acts for the nonmedical care of persons whose religious tenets lead them to reject medical services. The district court held that these amendments were not an establishment of religion. We affirm the district court.
 
 THE AMENDED STATUTES
 
 2
 42 U.S.C. § 1320c-11, as amended by the Balanced Budget Act, reads:
 
 
 3
 
 Exemptions for religious nonmedical health care institutions
 
 
 
 4
 The provisions of this part shall not apply with respect to a religious nonmedical health care institution (as defined in section 1395x(ss)(1) of this title).
 
 
 5
 42 U.S.C. § 1395x(e), as amended in its definitions, defines "hospital" to include
 
 
 6
 a religious nonmedical health care institution (as defined in subsection (ss)(1) of this section), with respect to items and services ordinarily furnished by such institution to inpatients, and payment may be made with respect to services provided by or in such an institution only to such extent and under such conditions, limitations, and requirements (in addition to or in lieu of the conditions, limitations, and requirements otherwise applicable) as may be provided in regulations consistent with section 1395i-5 of this title.
 
 
 7
 42 U.S.C. § 1395x(y)(1), as amended, reads:
 
 
 8
 
 Extended care in religious nonmedical health care institutions
 
 
 
 9
 The term `skilled nursing facility' also includes a religious nonmedical health care institution (as defined in subsection (ss)(1) of this section), (except for purposes of subsection (a)(2) of this section) with respect to items and services ordinarily furnished by such an institution to inpatients, and payment may be made with respect to services provided by or in such an institution only to such extent and under such conditions, limitations, and requirements (in addition to or in lieu of the conditions, limitations, and requirements otherwise applicable) as may be provided in regulations consistent with section 1395i-5 of this title.
 
 
 10
 The cross-referenced section x(ss)(1) reads in relevant part as follows:
 
 
 11
 
 Religious nonmedical health care institution
 
 
 
 12
 (1) The term "religious nonmedical health care institution" means an institution that —
 
 
 13
 (A) is described in subsection (c)(3) of section 501 of The Internal Revenue Code of 1986 and is exempt from taxes under subsection (a) of such section;
 
 
 14
 (B) is lawfully operated under all applicable Federal, State, and local laws and regulations;
 
 
 15
 (C) provides only nonmedical nursing items and services exclusively to patients who choose to rely solely upon a religious method of healing and for whom the acceptance of medical health services would be inconsistent with their religious beliefs;
 
 
 16
 (D) provides such nonmedical items and services exclusively through nonmedical nursing personnel who are experienced in caring for the physical needs of such patients;
 
 
 17
 (E) provides such nonmedical items and services to inpatients on a 24-hour basis;
 
 
 18
 (F) on the basis of its religious beliefs, does not provide through its personnel or otherwise medical items and services (including any medical screening, examination, diagnosis, prognosis, treatment, or the administration of drugs) for its patients; (G)(i) is not owned by, under common ownership with, or has an ownership interest in, a provider of medical treatment or services;
 
 
 19
 (ii) is not affiliated with —
 
 
 20
 (I) a provider of medical treatment or services, or
 
 
 21
 (II) an individual who has an ownership interest in a provider of medical treatment or services;
 
 
 22
 (H) has in effect a utilization review plan which —
 
 
 23
 (i) provides for the review of admissions to the institution, of the duration of stays therein, of cases of continuous extended duration, and of the items and services furnished by the institution,
 
 
 24
 (ii) requires that such reviews be made by an appropriate committee of the institution that includes the individuals responsible for overall administration and for supervision of nursing personnel at the institution,
 
 
 25
 (iii) provides that records be maintained of the meetings, decisions, and actions of such committee, and
 
 
 26
 (iv) meets such other requirements as the Secretary finds necessary to establish an effective utilization review plan;
 
 
 27
 (I) provides the Secretary with such information as the Secretary may require to implement section 1391i-5 of this title, including information relating to quality of care and coverage determinations; and
 
 
 28
 (J) meets such other requirements as the Secretary finds necessary in the interest of the health and safety of individuals who are furnished services in the institution.
 
 
 29
 (2) To the extent that the Secretary finds that the accreditation of an institution by a State, regional, or national agency or association provides reasonable assurances that any or all of the requirements of paragraph (1) are met or exceeded, the Secretary may treat such institution as meeting the condition or conditions with respect to which the Secretary made such finding.
 
 
 30
 (3)(A)(i) In administering this subsection and section 1395i-5 of this title, the Secretary shall not require any patient of a religious nonmedical health care institution to undergo medical screening, examination, diagnosis, prognosis, or treatment or to accept any other medical health care service, if such patient (or legal representative of the patient) objects thereto on religious grounds.
 
 
 31
 (ii) Clause (i) shall not be construed as preventing the Secretary from requiring under section 1395i-5(a)(2) of this title the provision of sufficient information regarding an individual's condition as a condition for receipt of benefits under part A of this subchapter for services provided in such an institution.
 
 
 32
 (B)(i) In administering this subsection and section 1395i-5 of this title, the Secretary shall not subject a religious nonmedical health care institution or its personnel to any medical supervision, regulation, or control, insofar as such supervision, regulation or control would be contrary to the religious beliefs observed by the institution or such personnel.
 
 
 33
 (ii) Clause (i) shall not be construed as preventing the Secretary from reviewing items and services billed by the institution to the extent the Secretary determines such review to be necessary to determine whether such items and services were not covered under part A of this subchapter, are excessive, or are fraudulent.
 
 
 34
 42 U.S.C. § 1395i-5, Conditions for coverage of religious nonmedical health care institutional services, as amended, reads in relevant part:
 
 
 35
 (a) In general Subject to subsections (c) and (d), payment under this part may be made for inpatient hospital services or post-hospital extended care services furnished an individual in a religious nonmedical health care institution only if —
 
 
 36
 (1) the individual has an election in effect for such benefits under subsection (b) of this section; and
 
 
 37
 (2) the individual has a condition such that the individual would qualify for benefits under this part for inpatient hospital services or extended care services, respectively, if the individual were an inpatient or resident in a hospital or skilled nursing facility that was not such an institution.
 
 
 38
 (b) Election
 
 
 39
 (1) In general
 
 
 40
 An individual may make an election under this subsection in a form and manner specified by the Secretary consistent with this subsection. Unless otherwise provided, such an election shall take effect immediately upon its execution. Such an election, once made, shall continue in effect until revoked.
 
 
 41
 (2) Form
 
 
 42
 The election form under this subsection shall include the following:
 
 
 43
 (A) A written statement, signed by the individual (or such individual's legal representative), that —
 
 
 44
 (i) the individual is conscientiously opposed to acceptance of nonexcepted medical treatment; and
 
 
 45
 (ii) the individual's acceptance of nonexcepted medical treatment would be inconsistent with the individual's sincere religious beliefs.
 
 
 46
 (B) A statement that the receipt of nonexcepted medical services shall constitute a revocation of the election and may limit further receipt of services described in subsection (a) of this section.
 
 
 47
 (3) Revocation
 
 
 48
 An election under this subsection by an individual may be revoked by voluntarily notifying the Secretary in writing of such revocation and shall be deemed to be revoked if the individual receives nonexcepted medical treatment for which reimbursement is made under this subchapter.
 
 
 49
 (4) Limitation on subsequent elections
 
 
 50
 Once an individual's election under this subsection has been made and revoked twice —
 
 
 51
 (A) the next election may not become effective until the date that is 1 year after the date of the most recent previous revocation, and
 
 
 52
 (B) any succeeding election may not become effective until the date that is 5 years after the date of the most recent previous revocation.
 
 
 53
 (5) Excepted medical treatment
 
 For purposes of this subsection:
 
 54
 (A) Excepted medical treatment
 
 
 55
 The term "excepted medical treatment" means medical care or treatment (including medical and other health services) —
 
 
 56
 (i) received involuntarily, or
 
 
 57
 (ii) required under Federal or State law or law of a political subdivision of a State.
 
 
 58
 (B) Nonexcepted medical treatment
 
 
 59
 The term "nonexcepted medical treatment" means medical care or treatment (including medical and other health services) other than excepted medical treatment.
 
 PROCEEDINGS
 
 60
 November 16, 2000, David Kong, identifying himself as a taxpayer of the United States and resident of the Northern District of California, filed the complaint initiating this case, challenging section 4454 of the Balanced Budget Act of 1997, as "a sect-specific establishment of religion" in its provisions for payment to Religious Nonmedical Healthcare Institutions (RNHCIs). Kong alleged that the only known institutions meeting the definitions of a RNHCI were Christian Science sanatoria promoting Christian Science spiritual healing and admitting for their services only Christian Scientists who had hired a Christian Science practitioner approved by The First Church of Christ, Scientist.
 
 
 61
 The United States defended the statute. The First Church of Christ, Scientist was permitted to intervene in its defense. After the submission of various declarations, motions for summary judgment were filed. The district court denied Kong's and granted those of the intervenor and of the United States. The district court took note of litigation in Minnesota that had challenged the 1965 version of Medicare and Medicaid because there was explicit exception for Christian Scientists objecting, according to their beliefs, to medical treatment and explicit authorization for the funding of physical services in Christian Science sanatoria. These sect-specific provisions were held to be unconstitutional as facially discriminating in favor of one religious body. Children's Healthcare Is A Legal Duty, Inc. v. Vladeck, 938 F.Supp. 1466, 1485 (D.Minn.1996) ("Child I"). The following year, Congress enacted the amendments challenged here, eliminating all explicit references to Christian Science. The same plaintiff which had been successful in Child I challenged the amendments and lost. Children's Healthcare Is A Legal Duty, Inc. v. Min De Parle, 212 F.3d 1084 (8th Cir.2000) ("Child II"), (affirming the judgment of the district court in 1998), cert. denied, 532 U.S. 957, 121 S.Ct. 1483, 149 L.Ed.2d 372 (2001).
 
 
 62
 The intervenor challenged Kong's standing, but the district court, citing Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), held that Kong had standing to pursue all his claims. The district court found that there was no evidence that the statute was drafted to favor Christian Science; that the statute did have the secular purpose of lifting a burden from those who were obliged to pay taxes for the health services but whose religious beliefs precluded them from receiving medical services; that the statutes did not impose a substantial burden on nonbeneficiaries of RNHCIs, the amount paid to these institutions in 1999 amounting to approximately $8 million; that the primary effect of the statute was not to advance religion, neither conveying a message of endorsement of a religion nor encouraging non-believers in a favored religion to change their religious beliefs to the favored religion; that the statute did not entangle the government excessively with religion; that the statute did not delegate governmental power to a church without public standards or public review; and that, as applied, the statute did not fund activity that was pervasively sectarian, the activity, instead, being essentially secular health care. The court concluded by noting the presumption in favor of a federal statute's constitutionality, a presumption particularly appropriate "when, as here, Congress specifically considered the question of the Act's constitutionality." Rostker v. Goldberg, 453 U.S. 57, 64, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981). The court cited to statements by Senator Kennedy, 143 Cong. Rec. S6322 (daily ed. June 25, 1997) and Senator Hatch, 143 Cong. Rec. S8447 (daily ed. July 31, 1997).
 
 
 63
 November 13, 2001, the district court entered judgment. This appeal timely followed.
 
 ANALYSIS
 
 64
 Jurisdiction. The intervenor has not renewed its challenge, but we are under obligation to satisfy ourselves that there is jurisdiction. Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) has been distinguished. Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 487, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), where it was observed: "The federal courts were simply not constituted as ombudsmen of the general welfare." The actual injury to Kong as a taxpayer is very small; the injury is to his principles, not his pocketbook. But assuming as we must the continued vitality of Flast, Kong has standing, and we have jurisdiction.
 
 
 65
 Establishment of religion: evolution. Establishment of a religion in the sense known to the Founders was well-expressed by Chief Justice Theophilus Parsons for the Supreme Judicial Court of Massachusetts describing the place of Protestant Christianity in the Commonwealth of Massachusetts:
 
 
 66
 And this religion, as understood by Protestants, tending by its effects to make every man submitting to its influence a better husband, parent, child, neighbor, citizen, and magistrate, was by the people established as a fundamental and essential part of their constitution.
 
 
 67
 Barnes v. First Parish in Falmouth, 6 Mass. 401 (1810). Establishment as essential part of the framework of government meant that "public Protestant teachers of piety" were required by the state constitution itself to be supported by tax laid on the population as a whole, Massachusetts Constitution of 1780, Part I, Art. III; that an oath be required of candidates for the legislature and principal executive officers disqualifying Catholics, Id., Part II, Ch. VI, Art. I; and that a college (Harvard) be publicly financed to educate, under supervision of Congregational clergy, students for service in "Church and State," Id. Part II, Ch. V, Art. I, Church and State not being separated but united.
 
 
 68
 The constitutional command at issue is the First Amendment: "Congress shall make no law respecting an establishment of religion." If we perform the elision and substitution effected by Justice Black in Everson v. Board of Education, 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711 (1947), the phrase becomes a prohibition against Congress making an establishment of religion of the kind celebrated by Chief Justice Parsons. As the Constitution has been interpreted in the past fifty years, religion has been understood broadly so that the Selective Service Act of 1951's reference "to religious training and belief in a Supreme Being" was functionally satisfied by "[a] sincere and meaningful belief which occupies in the life of its possessor a place parallel to that followed by the God of those admittedly qualifying for the exemption." United States v. Seeger, 380 U.S. 163, 176, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965). Establishment of religion has been found to exist, principally, in a state's aid to denominational pre-college schools, e.g. Committee for Public Educ. and Religious Liberty v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) and, occasionally, in a local government's promotion of a religious symbol, e.g. County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). No case is known, however, in which the Supreme Court discerned an establishment of religion in the federal funding of a federal program of assistance to the citizenry.
 
 
 69
 Strict separationists believe that any benefit bestowed by government on religion qualifies as "establishment." The metaphorical wall unmentioned by the First Amendment but celebrated by Everson, 330 U.S. at 16, 67 S.Ct. 504, cannot be porous. Abstractly speaking, their logic is impeccable. It is fortified by such sayings and aphorisms as "Don't let the camel's nose under the tent" and "Who says A must say B." But abstract logic and folk wisdom yield to historical experience. A variety of benefits have been bestowed by government on religious practices and either have been unchallenged or passed constitutional muster without fatal compromise of principle. A vital balance has been maintained rather than a syllogism parsed. Thus, for example, since the time of the First Congress, the government has paid for chaplains to pray for Congress. See Marsh v. Chambers, 463 U.S. 783, 787, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). Presidents have proclaimed days of prayer and of thanksgiving to God. E.g. Abraham Lincoln, Proclamation of Thanksgiving, July 15, 1863, in 6 The Collected Works of Abraham Lincoln 322 (Roy P. Basler ed., 1953). Hundreds of millions of dollars are spent annually to fund chaplains for the armed forces in war and in peace, abroad and in our own cities, paying not only for the religious services of the chaplains but also for the holy books and supplies used in acts of worship. See Katcoff v. Marsh, 755 F.2d 223, 229 (2d Cir.1985). The payment of chaplains by a state legislature has been upheld as constitutional by the Supreme Court. Marsh v. Chambers, 463 U.S. at 795, 103 S.Ct. 3330. Subsidy of buildings of worship by tax exemption, a universal practice of state and federal government, has been found not to be an establishment. Walz v. Tax Comm'n, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). Provisions in the draft law exempting from service members of "the historic Pence Churches" has been found unobjectionable. Arver v. U.S., 245 U.S. 366, 389, 38 S.Ct. 159, 62 L.Ed. 349 (1918); and the discrimination in favor of total pacifists has been upheld even when it appeared as a religious discrimination disfavoring conscientious objection to unjust war. Gillette v. U.S., 401 U.S. 437, 462, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971). History establishes that it is too late in the day to evoke an unbroken wall.
 
 
 70
 As history must play such a vital part in understanding what the Bill of Rights requires, it is also appropriate to note that at the time this charter of freedom was written, no massive programs of federal aid to the public existed. Just as the requirements of free speech have to be applied to a country in which television has become a form of speech, so the provision bearing on establishment must be understood in a country where federal aid is given to individuals in a broad range of categories and is as much taken for granted as a governmental function as the building of highways or the distribution of mail. As Everson itself holds, ordinary government services are not to be denied because they benefit a church or a church school. Everson, 330 U.S. at 18, 67 S.Ct. 504. Of the programs involved in this case, Medicare in 2001 disbursed $240 billion and Medicaid disbursed $129 billion. See Fiscal Year 2003 President's Budget for HHS, pgs. 64, 68, available at http://www.hhs.gov/budget/pdf/hhs 2003bib.pdf. In this cascade of money Congress has taken great pains to create a small island where persons who do not believe in medical help may have some governmental support comparable to that furnished by the government to those who do. We review its constitutionality under the familiar, oft-questioned prongs of Lemon v. Kurtzman, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973).
 
 
 71
 Passing the Prongs. The amendment does not advance religion. No one would become a Christian Scientist in order to obtain admission to an RNHCI when the cost of such a conversion would be renunciation of all medical treatment. The amendment indoctrinates no one in religion. The amendment does not symbolize government approval of faith healing. The amendment compels no belief. The amendment does not turn the mundane physical services that are provided into a "pervasively sectarian" activity. The extraordinary detail of the amended statutes evinces only a desire to accommodate a very small minority whose religious tenets put them in a position where they pay taxes, and, unless accommodated, would get no return from the taxes. Accommodation of a religious minority to let them practice their religion without penalty is a lawful secular purpose.
 
 
 72
 It was contended by Judge Lay dissenting in Child II that if this kind of accommodation is constitutional, it would be permissible for a state to pay for parochial schools on the theory that the pupils' parents had paid taxes to support public schools but were getting nothing in return. Child II, 212 F.3d at 1106 (Lay, J. dissenting). The analogy fails. The parochial schools are not permitted direct governmental support because they are engaged in promoting a religion and indoctrinating pupils in it. That is not how the physical care of the RNHCIs can be described.
 
 
 73
 The Delegated Government Power. An individual obtains admission to an RNHCI only if the individual "has a condition such that the individual would qualify for benefits ... for inpatient hospital services...." 42 U.S.C. § 1395i-5(a)(2). An RNHCI cannot use a medical examination or diagnosis to determine this condition or to admit or to discharge Medicare and Medicaid beneficiaries. 42 U.S.C. § 1395x(ss)(1)(F). As there is no medical examination, there are no apparent standards for admission except a belief that one needs admission and does not believe in medical help; and there are no apparent standards for discharge. Kong contends that consequently a governmental power is delegated to a religious institution, the RNHCI, in violation of the principle laid down in Larkin v. Grendel's Den, 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982). It is true that the power held unconstitutional in that case was an absolute power to deny a liquor license to a church's neighbors. In distinction, here the delegated power is to benefit persons seeking to be benefitted. In both Grendel's Den and here, government has delegated a governmental power without standards to guide its exercise.
 
 
 74
 The government argues that the RNHCI merely submits bills for reimbursement. The bills are not paid until approved by "a fiscal intermediary," which has no religious character. 42 U.S.C. § 1395h; 42 U.S.C. § 1395x(ss)(1)(H)-(J); § 1395x(ss)(3)(B)(ii); 42 C.F.R. § 405.1803; see Regions Hosp. v. Shalala, 522 U.S. 448, 452-453, 118 S.Ct. 909, 139 L.Ed.2d 895 (1998). There is, however, nothing for the financial intermediary to review as to the physical condition of the beneficiary who has been billed by the RNHCI. The fiscal intermediary can review whether the services that have been billed were provided. The fiscal intermediary has no means of determining whether the condition of the beneficiary justified admission or discharge.
 
 
 75
 The question presented, therefore, is whether delegation of governmental power without standards to institutions identified by their religious rejection of medicine is an unconstitutional establishment of religion. Exercise of the delegated power facilitates the payment of funds for physical services that are in themselves neither religious nor teaching a religion. If the power were not delegated and a medical examination or diagnosis were required to qualify for the benefits, the very purpose of the statutory accommodation would be defeated. Nonmedical help to persons religiously rejecting medical help can only be given by exempting them from proving any medical condition. Congress, aware of the constitutional difficulty, has attempted to achieve this objective.
 
 
 76
 The resulting legislation is not an establishment of religion as originally understood by the Framers. Even a penny of tax in aid of such an establishment is objectionable, as James Madison maintained in his famous Memorial and Remonstrance of 1785. See Everson v. Board of Education, 330 U.S. 1, 65-66, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (reprinting Madison's Memorial and Remonstrance). Here an arguably unconstitutional delegation of power to religious institutions has occurred; but it has occurred as the only way of unburdening an exercise of religious belief. Logic leads us to condemn the establishment. The history of this country, with its willingness to let new religions be founded and flourish, counsels against extending Grendel's Den further. It is more in tune with the Bill of Rights to give relief to a religious minority than to find a constitutional evil in congressional response to a constituency. When the government is in the business of taxing for health care and providing it to its citizens, an incidental expenditure, less than 1/10 of 1% of the amount annually expended, in order to accommodate, to a degree, the religious beliefs of a minority is not reasonably read as an establishment of religion. In this case, as in many cases involving government relationship to religion, Holmes's dictum holds: "A page of history is worth a volume of logic." NY Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 65 L.Ed. 963 (19821). Accordingly, the judgment of the district court is AFFIRMED.
 
 McKEOWN, Circuit Judge, concurring:
 
 77
 I agree that accommodation of individuals who are religiously opposed to medical care, including Christian Scientists, is appropriate, but conclude that the statute must be read to encompass both religious and nonreligious beliefs in order to pass constitutional muster. As Justice O'Connor succinctly explained in Board of Education of Kiryas Joel Village School District v. Grumet, 512 U.S. 687, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994), "[r]eligious needs can be accommodated through laws that are neutral with regard to religion." Id. at 714, 114 S.Ct. 2481 (O'Connor, J., concurring). This principle best reflects our current understanding of the Religion Clauses: although "[p]erhaps in the early days of the Republic" the words of the Free Exercise and Establishment Clauses "were understood to protect only the diversity within Christianity ... today they are recognized as guaranteeing religious liberty and equality to `the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism.'" County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573, 590, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (quoting Wallace v. Jaffree, 472 U.S. 38, 52, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985)). With this understanding in mind, I concur in the judgment of the court upholding the constitutionality of the statute, albeit doing so via a religiously-neutral construction of the statute.
 
 
 78
 With due respect to Judge Noonan, the resolution of this case cannot be divined from "a page of history." (Op. at 20.) Rather, given the complicated and intricate development of Establishment Clause jurisprudence, the analysis is more nuanced, requiring a scalpel, not a broad brush. Indeed, the multiple plurality opinions spawned in modern Establishment Clause cases underscore the delicate distinctions drawn by the Supreme Court. Our own opinion here, consisting of a one-judge opinion, joined by two concurrences, reflects the difficulty in applying the Court's distinctions. Just as "history cannot legitimate practices that demonstrate the government's allegiance to a particular sect or creed," County of Allegheny, 492 U.S. at 603, 109 S.Ct. 3086, historical practice alone cannot resolve the question before us. The Court's decision in Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), upholding the payment of chaplains by a state legislature, did not announce a principle ratifying otherwise impermissible religious accommodations merely by virtue of historical precedent. Marsh "plainly does not stand for the sweeping proposition... that all accepted practices 200 years old and their equivalents are constitutional today." County of Allegheny, 492 U.S. at 603, 109 S.Ct. 3086.
 
 
 79
 Nor can it be said that a static historical approach is "more in tune with the Bill of Rights." (Op. at 19.) We are not, as suggested, faced with the choice of "giv[ing] relief to a religious minority" versus "finding a constitutional evil in congressional response to a constituency." Id. Rather, the Constitution and Supreme Court precedent require us to undertake an analysis of the nature and context of the accommodation in the framework of the Establishment Clause. Having done so, I am of the view that we can sustain the accommodation simply by construing the statute in a religion-neutral manner. The government acknowledges this solution in its briefing and indeed recommended such a construction in earlier correspondence with Congress.[1]
 
 
 80
 Although the statutory provisions are lengthy, in the context of this case, their essence boils down to two phrases, the first relating to the individual recipient of care and the second to the institutional provider of care: 1) the individual must be "conscientiously opposed" to medical treatment such that acceptance of care is "inconsistent with the individual's sincere religious beliefs," 42 U.S.C. § 1395i-5(b)(2)(A)(i-ii) (emphasis added); and 2) the facility must be "a religious nonmedical healthcare institution," id. § 1320c-11 (emphasis added) (collectively referred to as " § 4454," which is found within the Balanced Budget Act of 1997). The heart of the dispute is the singling out of religious beliefs and religious institutions for special treatment — that is, for an accommodation.
 
 
 81
 I begin with the longstanding "principle at the heart of the Establishment Clause, that government should not prefer one religion to another, or religion to irreligion." Kiryas Joel, 512 U.S. at 703, 114 S.Ct. 2481 (emphasis added). This foundation paves the way for two intertwined principles that govern my analysis: an accommodation restricted to religion must remove "a significant state-imposed deterrent to the free exercise of religion," Texas Monthly Inc. v. Bullock, 489 U.S. 1, 2, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989) (plurality opinion) (emphasis added), and a permissible accommodation may not distinguish among theistic, nontheistic and atheistic beliefs. Kiryas Joel, 512 U.S. at 716, 114 S.Ct. 2481 (O'Connor, J., concurring); see also Torcaso v. Watkins, 367 U.S. 488, 495, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961) (observing that the federal government cannot "constitutionally pass laws or impose requirements which aid all religions as against non-believers...." (footnotes omitted)).
 
 
 82
 The desire to accommodate the Christian Scientists' beliefs is understandable in light of our nation's history of religious accommodation. And Congress' effort to expand the reach of the statute beyond the sect-specific designation, once the original statute was declared unconstitutional, see Children's Healthcare is a Legal Duty, Inc. v. Vladeck, 938 F.Supp. 1466 (D.Minn. 1996), is laudable. But these efforts do not remove constitutional doubts created by the statute. For starters, it is doubtful that the accommodation has the purpose and effect of alleviating "a significant state-imposed deterrent to the free exercise of religion." Texas Monthly, 489 U.S. at 15, 109 S.Ct. 890; see also Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 335, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987) ("[I]t is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." (emphasis added)). Just as significant is the fact that the accommodation threatens to "burden[] nonbeneficiaries markedly" because it impermissibly exempts only those whose objection to all medical care is grounded in religious, rather than non-religious, belief. Texas Monthly, 489 U.S. at 15, 109 S.Ct. 890.
 
 
 83
 I agree with the Eighth Circuit that the Free Exercise Clause jurisprudence in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and its progeny "provide[s] a starting point for determining when a government-imposed burden is sufficient to warrant a permissive accommodation." Children's Healthcare is a Legal Duty, Inc. v. Min De Parle, 212 F.3d 1084, 1094 (8th Cir.2000). However, the religious objector to medical care occupies a more complex position with regard to the benefits at stake than the plaintiff in Sherbert.[2] Medicare does not create any general right to custodial care that is not integrated into a program of medical care. See 42 U.S.C. § 1395y(a)(9). Thus, unlike the Sabbath observer receiving unemployment benefits in Sherbert, the adherent of faith healing rejects, at the very least, a major portion of the integrated medical benefit itself, and not just the qualifications to receive the benefit. In addition, the religious objector seeks to receive the benefit in a different manner than other patients — outside the hospital setting and without the supervision of health care professionals.
 
 
 84
 These important differences cast substantial doubt on the contention that the religious objectors to medical care receive merely a subset of the benefits ordinarily received by other patients. In effect, the religious objector wants to unbundle medical and non-medical services in a way that would effectively rewrite the Medicare and Medicaid framework. Thus, for example, Medicare will only reimburse for hospice care, a type of custodial care, if a doctor certifies that the patient is terminally ill and has less than six months to live. See 42 U.S.C. §§ 1395y(a)(1)(c), 1395x(dd)(3); 42 C.F.R. § 418.22 (1998). Under § 4454, in contrast, the qualifying patient need only have a condition that would otherwise require hospitalization. See 42 U.S.C. § 1395i-5(a)(2). Because, under Medicare, the types of nonmedical benefits available under § 4454 are normally authorized only when part and parcel of medical care, one could interpret § 4454 as bestowing upon religious objectors a special entitlement to "custodial care" that others do not receive. See 42 U.S.C. § 1395y(a)(9); 42 C.F.R. §§ 409.33(d), 409.32(b) (prohibiting reimbursement for custodial care unless "special medical complications" require routine care to be "performed or supervised by skilled nursing or rehabilitation personnel."). Undoubtedly, many individuals would welcome coverage of free-standing custodial care, but such an arrangement is simply not covered under the current scheme.
 
 
 85
 Nor can it be said that Religious Nonmedical Health Care Institutions ("RNHCIs") suffer from anything approaching the "significant" burden that justifies drawing distinctions between religious and non-religious institutions under Texas Monthly and Amos. In Amos, the accommodation for religious groups removed government regulation that interfered with the groups' ability to define and advance their religious missions. See 483 U.S. at 336, 107 S.Ct. 2862. Here, in the absence of § 4454, religious groups would not be burdened in espousing or practicing their beliefs eschewing medical care. Thus, § 4454 places RNHCIs in the same favored position vis a vis nonreligious institutions that the Supreme Court held violated the Establishment Clause in Texas Monthly. See 489 U.S. at 14, 109 S.Ct. 890 (striking down a Texas tax benefit only for religious publications) (plurality opinion); id. at 29, 109 S.Ct. 890 (Blackmun, J., joined by O'Connor, J., concurring) (agreeing with the plurality). Because institutions, unlike individuals, have no entitlement to receive Medicare funds, § 4454 "cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion" for RNHCIs. Id. at 15, 109 S.Ct. 890.[3]
 
 
 86
 The second flaw in § 4454 is that it appears to exempt only those whose objection to medical care is grounded in religious belief. The government mistakenly asserts that Amos supports providing a medical objector exemption exclusively for religious individuals. See 483 U.S. at 338, 107 S.Ct. 2862. But Amos did not alter the "constitutional command" that government "pursue a course of neutrality toward religion, favoring neither one religion over others nor religious adherents collectively over nonadherents." Kiryas Joel, 512 U.S. at 696, 114 S.Ct. 2481 (opinion of Souter, J.) (citing Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968)).
 
 
 87
 Amos teaches that the government need not grant benefits to secular groups when lifting burdens on religious ones, but it does not follow that government can select from among similarly-burdened individuals and favor the religious over the non-religious. Such an unnecessarily broad reading of Amos would conflict with Supreme Court jurisprudence regarding individual accommodations. See Estate of Thornton v. Caldor, 472 U.S. 703, 710, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985) (striking down a law guaranteeing only religious employees the right to take off the Sabbath day); Sherbert, 374 U.S. at 410, 83 S.Ct. 1790 (reciting the principle that "no State may `exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, because of their faith, or lack of it, from receiving the benefits of public welfare legislation.'" (emphases added) (quoting Everson v. Bd. of Educ., 330 U.S. 1, 16, 67 S.Ct. 504, 91 L.Ed. 711 (1947))).
 
 
 88
 Those individuals who reject medical care for principled reasons are equally burdened by a requirement that they either violate their principles or give up government health care benefits. The government may not selectively lift this burden only from the shoulders of the religious. When it does, the government doubles the burden on those whose objection to medical care is not faith-based, but who would be required to profess a religious belief in order to qualify for the exemption, and would be required to receive their benefits in religious institutions. See Torcaso, 367 U.S. at 495-96, 81 S.Ct. 1680 (striking down a state law requiring officeholders to profess a belief in the existence of God). In providing the Medicare exemption only for the religious, the government places its "prestige, coercive authority, [and] resources behind ... religious belief in general" and "cannot but convey a message of endorsement to slighted members of the community." Texas Monthly, 489 U.S. at 9, 15, 109 S.Ct. 890 (quoting Amos, 483 U.S. at 348, 107 S.Ct. 2862 (O'Connor, J., concurring in the judgment)).[4]
 
 
 89
 These serious questions about the constitutionality of § 4454 could be resolved by excising the references to religion. The Supreme Court has "frequently relied explicitly on the general availability of any benefit provided religious groups or individuals in turning aside Establishment Clause challenges." Kiryas Joel, 512 U.S. at 704, 114 S.Ct. 2481; see also Bowen v. Kendrick, 487 U.S. 589, 608, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988); Witters v. Washington Dep't of Servs. for the Blind, 474 U.S. 481, 487, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986); Walz v. Tax Comm'n, 397 U.S. 664, 673, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). This solution was identified six years ago by none other than the Attorney General, who invoked the principles I have discussed in urging Congress to expand the scope of the exemption to include non-religious objectors. See Attorney General Letter at 4-5, 11. In the letter, the Attorney General observed that "the government may not provide a public benefit exclusively to religious adherents," and urged Congress to create "a `conscientious objector' class of beneficiaries, patterned on the class of conscientious objectors that has been constitutionally permissible in the context of military service." Id. at 4, 11.
 
 
 90
 The Attorney General now supports the religious restrictions, but his brief acknowledges that § 4454 would still be operative without them, and that Congress' goal of accommodating "the needs of person who have sincere religious objections to medical care" could be accomplished absent any reference to religion. Indeed, in the face of constitutional doubts, it is difficult to imagine that Congress would not choose to extend benefits to what must surely be a small number of similarly-situated non-religious objectors. See INS v. St. Cyr, 533 U.S. 289, 300 n. 12, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) ("The courts will ... not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it." (internal citations and quotation marks omitted)); New York v. United States, 505 U.S. 144, 186, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) ("Unless it is evident that [Congress] would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as law.").
 
 
 91
 I conclude, however, that it is not necessary to invalidate any part of § 4454 as it is currently written. The Supreme Court's expansive interpretation of the draft exemption provides the template for interpreting § 4454 in a way that avoids constitutional problems. See St. Cyr, 533 U.S. at 300-01, 121 S.Ct. 2271 ("[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is fairly possible, we are obligated to construe the statute to avoid such problems." (internal quotation marks and citation omitted)). The draft statute's text exempted from military service anyone who, "by reason of religious training and belief, is conscientiously opposed to participation in war." Welsh v. United States, 398 U.S. 333, 336, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970) (plurality opinion) (discussing § 6(j) of the Universal Military Training and Service Act); United States v. Seeger, 380 U.S. 163, 173, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) (same). In Welsh and Seeger, the Supreme Court concluded that the exemption applied to those whose objection to military service was grounded, not just in religious faith, but in any belief held "with the strength of traditional religious convictions." Welsh, 398 U.S. at 340, 90 S.Ct. 1792 (plurality); see Seeger, 380 U.S. at 187, 85 S.Ct. 850; cf. Welsh, 398 U.S. at 366-67, 90 S.Ct. 1792 (Harlan, J., concurring in the result as a "patch work of judicial making that cures the defect of underinclusion").
 
 
 92
 I would construe § 4454, like the Supreme Court did the draft exemption, as extending to all "whose consciences, spurred by deeply held moral, ethical, or religious beliefs, would give them no rest or peace if they allowed themselves" to receive any medical treatment.[5] Id. at 344, 90 S.Ct. 1792 (1970) (plurality opinion) (interpreting the draft exemption); see also 32 C.F.R. §§ 75.3(b), 75.5(c)(1) (setting forth the belief requirement for military conscientious objection). The Constitution requires that the carve-out for nonmedical care include those whose moral and ethical beliefs place them on the same plane as religious adherents. See Estate of Thornton, 472 U.S. at 711, 105 S.Ct. 2914 (O'Connor, J., concurring) (holding that a statute giving special treatment to Sabbath observers is unconstitutional because it did not extend similar treatment to "ethical and religious beliefs and practices of other private employees"). In defending an exclusively-religious exemption, the government misses the point that "what makes accommodation permissible, even praiseworthy" is that "the government is accommodating a deeply held belief." Kiryas Joel, 512 U.S. at 715 (O'Connor, J., concurring). The "equal-footing" approach I have outlined meets the needs of the Christian Scientists and all objectors to medical care while remaining true to Establishment Clause principles. With this neutral construction of § 4454 in mind, I concur in the result.
 
 
 
 Notes:
 
 
 [1]
 In reviewing the proposed legislation in 1997, the Department of Justice highlighted its constitutional concerns with the proposed statutory preference for religious beliefs and institutions and advised Congress that a "religion-neutral statute ... provides a framework for legislation that could pass constitutional muster while at the same time attempting to limit the risk of substantial cost increases on Medicare and Medicaid." Letter from Andrew Fois, Assistant United States Attorney General to the Hon. Henry J. Hyde, Chairman of Committee on the Judiciary, U.S. House of Representatives, at 2 (June 13, 1997) ("Attorney General Letter")
 
 
 [2]
 InSherbert, the Court held that the state could not require the plaintiff to abandon her religious objection to working on the Sabbath in order to receive unemployment benefits. 374 U.S. at 401, 83 S.Ct. 1790. See also, e.g., Frazee v. Ill. Dep't of Employment Sec., 489 U.S. 829, 832, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989). The Court later applied the same principle to a plaintiff who objected to working on armaments. See Thomas v. Review Board of Indiana Employment Security Division, 450 U.S. 707, 717-18, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) ("Where the state conditions receipt of an important benefit upon conduct proscribed by religious faith ..., thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists.").
 
 
 [3]
 The First Church of Christ, Scientist relies onChrisman v. Sisters of St. Joseph of Peace, 506 F.2d 308, 310-11 (9th Cir.1974), for the proposition that § 4454 provides an accommodation for RNHCIs. In Chrisman, we concluded that a provision that allowed religious hospitals receiving federal construction funds to refuse to perform sterilizations was a religious accommodation consistent with the Establishment Clause. Id. at 311-12. However, unlike Medicare and Medicaid, the program in Chrisman was an entitlement for hospitals, not patients.
 
 
 [4]
 The government makes the unconvincing argument that limiting § 4454 only to the religious is justified on the ground that it helps keep down the cost of administering the exemption. But the Religion Clauses are not cost-cutting tools. Our decision inDroz v. CIR, 48 F.3d 1120 (9th Cir.1994), upholding the exemption from Social Security taxes for the Amish, see 26 U.S.C. 1402(g), does not support the government's position. In contrast to patients receiving benefits under § 4454, the Amish exist outside the Social Security system altogether; they do not pay taxes or receive benefits because they have their own system of welfare. See Droz, 48 F.3d at 1123 ("[T]he fact that § 1402(g)'s effect is to neither advance nor inhibit religion is shown by the requirement that a person must waive all Social Security benefits to receive an exemption."). It was this separate welfare system that distinguished the Amish from other sects objecting to participation in the Social Security system. Id. at 1124. Here, the government can provide no equivalent justification for limiting § 4454's exemption only to the religious.
 
 
 [5]
 The same principles require a similarly-expansive interpretation of § 4454's other "religious" requirements — that the objector rely exclusively on a "religious" method of healing and receive care only in a "religious" nonmedical health care institutionSee 42 U.S.C. § 1395x(ss)(1)(C).
 
 
 RAWLINSON, Circuit Judge, concurring:
 
 93
 I concur in the result. I write separately to emphasize that, in my view, the Eighth Circuit's analysis in Children's Healthcare v. Min De Parle, 212 F.3d 1084 (8th Cir.2000), should carry the day.
 
 
 94
 In Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 335, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987), the United States Supreme Court recognized that "it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions."
 
 
 95
 As the Eighth Circuit noted, the Medicare provisions, without any accommodation to the beliefs of the Christian Scientists, would significantly burden their religious practice. For example, Medicare's requirement that a doctor certify eligibility for hospice care is the antithesis of the Christian Scientists' fundamental beliefs, which eschew any medical treatment in the conventional sense. This and other medically based provisions impose a significant burden on the Christian Scientists' exercise of their religion.
 
 
 96
 The fact that, so far, only Christian Scientist sanitaria qualify as RNMHCIs is not dispositive. Nothing prevents other groups from qualifying for and taking advantage of the same Medicare provisions that benefit the Christian Scientists. See Min De Parle, 212 F.3d at 1091.
 
 
 97
 § 4454 has the valid secular purpose of extending health care coverage to the optimum number of people, while at the same time undershoring the Medicare and Medicaid programs. Accordingly, the legislation is not subject to strict scrutiny. See id. at 1092.
 
 
 98
 If not subject to strict scrutiny, § 4454 must pass the three-part test articulated by the United States Supreme Court in Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105 (1971). That test results in clearance under the Establishment Clause if the law: 1) has a secular purpose; 2) has a primary effect of neither advancing nor prohibiting religion; and 3) "does not foster excessive government entanglement with religion." Min De Parle, 212 F.3d at 1093 (citation omitted).
 
 
 99
 As discussed above, the secular purpose underlying § 4454 is to extend health coverage to a broader range of people, while bolstering the Medicare and Medicaid programs. At the same time, the government is also entitled to take note of and alleviate the burden that religious entities sustain as a result of the government's exercise of its power. See Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet, 512 U.S. 687, 705, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994); see also Amos, 483 U.S. at 338, 107 S.Ct. 2862.
 
 
 100
 As the Eighth Circuit observed in Min De Parle: "[a]bsent § 4454, the Medicare and Medicaid Acts place individuals who hold religious objections to medical care in a situation similar to that contemplated by the Sherbert line of cases. They are forced to choose between adhering to their religious beliefs and foregoing all government health care benefits, or violating their religious convictions and receiving the medical care ..." Min De Parle, 212 F.3d at 1093. Removal of the burden of the Hobson's choice serves a legitimate secular purpose. See id. at 1092.
 
 
 101
 The law's primary effect is to neither advance nor inhibit religion. § 4544 does not impose a substantial burden on nonbeneficiaries or exclusively benefit religious believers. See Texas Monthly Inc. v. Bullock, 489 U.S. 1, 15, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989). § 4544 simply does not foster excessive government entanglement with religion. Although qualified RNHCIs make an initial recommendation regarding eligibility for Medicare and/or Medicaid coverage, as with other health care providers, the government makes the final decision regarding a patient's entitlement to Medicare or Medicaid benefits. See 42 U.S.C. §§ 1395x (ss)(1)(H)-(J); 1395x (ss)(3)(B)(ii). The government's involvement is no more, no less than with any other health care provider, and is by no means excessively entangled.
 
 
 102
 I am persuaded by the rationale set forth in the Eighth Circuit's Min De Parle decision that § 4544 is not subject to strict scrutiny and satisfies the Lemon test. Therefore, I concur in the majority's conclusion that the district court's ruling should be AFFIRMED.